780 So.2d 125 (2001)
Eddie LEWIS, Appellant,
v.
The STATE of Florida, Appellee.
Nos. 3D98-2039, 3D98-2160.
District Court of Appeal of Florida, Third District.
January 24, 2001.
*126 Bennett H. Brummer, Public Defender, and Maria E. Lauredo and Robert Kalter, Assistant Public Defenders, for appellant.
Robert A. Butterworth, Attorney General, and Paulette R. Taylor, Assistant Attorney General, for appellee.
Before SCHWARTZ, C.J. and JORGENSON, COPE, LEVY, GERSTEN, GODERICH, GREEN, FLETCHER, SHEVIN, SORONDO and RAMIREZ, JJ.

ON REHEARING EN BANC
SORONDO, J.
After a second jury trial,[1] Eddie Lewis (defendant), age sixteen at the time of the offenses, was convicted of felony murder, robbery and attempted robbery, all with a firearm. The evidence presented included an eyewitness identification by the uninjured robbery victim, Noel McPhee, and a post-arrest confession made two weeks after the incident.
Defendant has moved for rehearing en banc asserting that this Court's panel opinion condones the prosecutor's improper closing arguments, which attacked defense counsel's integrity, implied he suborned perjury, bolstered the credibility of state witnesses and appealed to the jury's sympathy.[2]

Facts
Noel McPhee, a former Bahamian police officer, left a nightclub at 2:30 a.m. and went to his car in the corner of the parking lot. As he tried to start the car, he heard a man say, "pass me your jewelry." McPhee looked up and saw the robber, *127 who held a black firearm and appeared nervous. The man told him not to look at him and McPhee looked away through his passenger window, back toward the club. McPhee saw Bertram Williams standing approximately seventy-two feet away by the club's back door, speaking with another individual. The robber told McPhee not to look in that direction. The robber instructed McPhee to quickly remove his jewelry or he would shoot him. McPhee handed over his necklace and the robber continued to rush him about his bracelet. McPhee testified that he was able to see the perpetrator's face. As he was removing his bracelet, he heard a gunshot. He looked back and saw that Williams had been shot. The shooter, who was wearing a mask, ran from the parking lot and fired a second shot into the air. The man who robbed McPhee said, "let's go," and he, the shooter, and a third person got into a white vehicle and left.
McPhee described his assailant to police at the scene as a light-skinned black male in his early twenties, approximately six feet or six feet and one inch and weighing 200-210 pounds.[3] He went to the station and chose defendant's picture from a photo album as the man who "looked like" the person who robbed him. When asked whether he was certain about the identification, he responded that he was sure. At trial, McPhee again identified defendant and testified that he was sure of his identification.
Officer Villaverde testified that he learned that Williams had an altercation with three men, one of whom had an extensive record, at the club around 8:00 p.m. on the night of the murder. These men were linked to a white four-door vehicle such as the one seen by McPhee. Although the police knew their identities, Villaverde did not include pictures of them in the albums shown to McPhee. Villaverde also testified regarding defendant's interrogation, which led to his confession.
According to defendant's statement, he was riding in a white car driven by another juvenile named Chrissy, along with one of Chrissy's friends. Chrissy told defendant that he and his friend were "fixing to go on a caper." Defendant understood this meant they intended to rob someone. Chrissy drove to the club parking lot and told defendant to get out of the car. Defendant argued that he did not want to go and Chrissy called him names. Defendant then followed Chrissy, who was wearing a black mask at the time. Chrissy told defendant to rob one man while he robbed another.
Defendant further stated in his confession that he approached a man, asked for his jewelry and told him to be quiet because he did not want to hurt him. The man gave defendant a necklace and a bracelet. Defendant saw Chrissy arguing with the person he was attempting to rob. Chrissy demanded the person's jewelry and threatened him with a .380 or 9mm gun (both semi-automatic firearms). The victim refused and Chrissy "then crazy shot him." Chrissy fired another shot in the air. Defendant yelled, "come on," and the juveniles drove away.
At trial, defendant denied committing the robbery. He testified that his false confession was the product of coercion and based upon facts related to him during his interrogation by the police, including the fact that the victim was shot with a .380 or a 9mm semiautomatic gun.[4] Defendant testified that the police threatened that he would never see his parents again; that he would be prosecuted in juvenile court in return for the statement; and that they were there to protect his rights.
The state's case rested on McPhee's identification and the defendant's confession. The defense argued that McPhee's *128 description of his assailant was so dramatically inconsistent with defendant's physical appearance that his subsequent identification was unreliable. As concerns the confession, the defense asserted that it was not voluntarily given and should therefore be disregarded.[5] To bolster the lack of voluntariness argument, the defense highlighted three critical facts. First, contrary to police testimony, no effort had been made to contact defendant's parents prior to the interrogation.[6] Second, the defendant's claim that the police had told him what to say in his confession was corroborated by the fact that, contrary to defendant's confession, the murder had not been committed with either a .380 or 9mm firearm.[7] Finally, the defense argued that Detective Villaverde had misled defendant into believing that Detective Barnabe, the "juvenile officer," was there to look after defendant's best interest.[8]

Analysis
In his motion for rehearing en banc, defendant directs his arguments solely at the prosecutor's improper arguments during summation. We, therefore, address only this issue.
The state argues that because defendant did not object to all of the objectionable comments, the issue has not been properly preserved for appellate review. Although the preserved errors in closing, *129 alone, may seem insufficient to require reversal, we conclude that the Florida Supreme Court's decision in Ruiz v. State, 743 So.2d 1 (Fla.1999), allows review of all comments made by the prosecutor during summation. In Ruiz, the Court stated:
The State argues that because defense counsel failed to object to several of the prosecutor's guilt and penalty phase statements he is barred from raising this issue on appeal. We disagree. When properly preserved comments are combined with additional acts of prosecutorial overreaching set forth below, we find that the integrity of the judicial process has been compromised and the resulting convictions and sentences irreparably tainted.
Id. at 7. See also Rivero v. State, 752 So.2d 1244 (Fla. 3d DCA 2000).
The first two comments that drew objections concerned attacks on defense counsel based on his cross of McPhee:
Do you recall the abuse and ridicule piled on him by Defense counsel on cross-examination?
. . . .
I thought we were in a rape case and I had a woman up here who had been raped.
The prosecutor was ordered to rephrase the first question and the jury was instructed to disregard the second remark. Both of these comments concerned extensive questioning about the fact that McPhee left the Bahamian police department years before under questionable circumstances, which led the witness to proclaim, "I am not on trial."
The last two comments that were preserved related to improper appeals to sympathy:
[A] man has lost his life because of this caper someone is not going to be a father
The defendant objected to this statement and the trial court correctly sustained the objection. Undeterred by the court's ruling, the prosecutor continued with the same improper argument:
Someone is not going to grow old and enjoy
The defendant repeated his objection, which the court, inexplicably, overruled. The prosecutor proceeded to finish his thought:
[A]nd enjoy the everyday things that you and I take for granted because of this caper.
In rebuttal, just after telling the jury that sympathy could have nothing to do with their verdict, the prosecutor made two additional, un-objected to appeals to sympathy:
You can't be sympathetic to the victim, Bertram Williams, or his family, because he is dead.
. . . .
Bertram Williams died. And that person is going to be dead forever. We can't say don't worry, we understand, just don't let it happen again. That's not what human life means.
Such appeals to sympathy by the prosecution have been held to be improper. See King v. State, 623 So.2d 486, 488 (Fla. 1993); Garron v. State, 528 So.2d 353, 359 (Fla.1988)("When comments in closing argument are intended to and do inject elements of emotion and fear into the jury's deliberations, a prosecutor has ventured far outside the scope of proper argument."); Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985)("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.").
None of the more egregious comments in this case were objected to below. *130 The prosecutor made several attacks on defense counsel's integrity and implied that he suborned perjury:
If he could walk polka dotted pink elephants into this courtroom, he would do it ... [defense counsel] is a highly skilled attorney with razor sharp skills.
. . . .
Also, did [the defendant] look like a little kid up on that witness stand yesterday? What you saw was an extremely well produced, and directed, and scripted story. And as sure as I am standing before you right now, you know that they went over, and over, and over, that story until they got it right.

. . . .
If I had a bridge, I would ask him to sell it for me.
. . . .
But [defense counsel] will tell you anything to get you to look away from the man who is sitting next to him, the Defendant.
. . . .
Everything around this circle are the pink elephants that the Defense counsel brings before you, and it's called reasonable doubt. That's B.S.
(Emphasis added). The law is clear that attacks on defense counsel are highly improper and impermissible. See Barnes v. State, 743 So.2d 1105 (Fla. 4th DCA), review denied, 744 So.2d 457 (Fla.1999); D'Ambrosio v. State, 736 So.2d 44 (Fla. 5th DCA 1999); Del Rio v. State, 732 So.2d 1100 (Fla. 3d DCA 1999); Lewis v. State, 711 So.2d 205 (Fla. 3d DCA 1998); Cochran v. State, 711 So.2d 1159 (Fla. 4th DCA 1998); Landry v. State, 620 So.2d 1099, 1102 (Fla. 4th DCA 1993); Valdez v. State, 613 So.2d 916 (Fla. 4th DCA 1993); Ryan v. State, 457 So.2d 1084, 1089 (Fla. 4th DCA 1984); Briggs v. State, 455 So.2d 519 (Fla. 1st DCA 1984); McGee v. State, 435 So.2d 854 (Fla. 1st DCA 1983); Westley v. State, 416 So.2d 18 (Fla. 1st DCA 1982); Melton v. State, 402 So.2d 30 (Fla. 1st DCA 1981); Hufham v. State, 400 So.2d 133 (Fla. 5th DCA 1981); Simpson v. State, 352 So.2d 125 (Fla. 1st DCA 1977); Thompson v. State, 318 So.2d 549 (Fla. 4th DCA 1975); Cochran v. State, 280 So.2d 42 (Fla. 1st DCA 1973). The most egregious of these comments was the one suggesting that defense counsel had "scripted," i.e. suborned, what the prosecutor was obviously arguing was the defendant's perjured testimony. Although the prosecutor is free to suggest to the jury that defendant's testimony was not credible, if the record evidence suggests that it was not, he was not free to opine that defendant's lack of candor was scripted by defense counsel.
Finally, the prosecutor also bolstered the police officers' credibility:
But does that mean that Detective Bernabe, Sergeant Everett, Detective Villaverde, and Howard Gazzo all conspired to walk into this courtroom and raise their right hand and commit perjury and lie under oath, jeopardize their careers, their families, place their livelihood on the line? For what?
This type of argument has been repeatedly held to constitute improper bolstering. See Fryer v. State, 693 So.2d 1046, 1047 (Fla. 3d DCA 1997); Buckner v. State, 689 So.2d 1202 (Fla. 3d DCA 1997); Cisneros v. State, 678 So.2d 888 (Fla. 4th DCA 1996); Davis v. State, 663 So.2d 1379 (Fla. 4th DCA 1995); Garrette v. State, 501 So.2d 1376 (Fla. 1st DCA 1987); Landry v. State, 620 So.2d 1099 (Fla. 4th DCA 1993); Blackburn v. State, 447 So.2d 424 (Fla. 5th DCA 1984); Richmond v. State, 387 So.2d 493 (Fla. 5th DCA 1980); and Francis v. State, 384 So.2d 967 (Fla. 3d DCA 1980).
The state does not attempt to individually justify any of the un-preserved comments. Rather, it argues that the defendant was not deprived of a fair trial because the evidence was overwhelming. McPhee's identification, the state *131 suggests, was unshakable and the details of McPhee's eyewitness testimony were mirrored by the defendant's own confession. We cannot agree.
In Lopez v. State, 555 So.2d 1298 (Fla. 3d DCA 1990), this court held that in order for a prosecutor's comment to merit a new trial, the comment must be of such a nature as to: 1) deprive the appellant of a fair trial; 2) materially contribute to his conviction; 3) be so harmful or fundamentally tainted as to require a new trial; or 4) be so inflammatory that it might have influenced the jury to reach a more severe verdict than that which they would have reached otherwise.
Applying this standard of review, we conclude that the prosecutor's grossly improper comments in summation require a reversal of the defendant's convictions and sentences. Contrary to the state's suggestion that the evidence was overwhelming, this was a close case where the credibility of the state's witnesses was absolutely critical.[9] We therefore conclude that the prosecutor's bolstering of the police officers' testimony, which was critical to establishing the voluntariness of the confession, the appeals to sympathy and the repeated attacks on defense counsel's integrity, including the suggestion that he had suborned defendant's perjury and improperly cross-examined the state's only eye witness, deprived the defendant of a fair trial.
Reversed and remanded for a new trial.
NOTES
[1] The first trial ended with a hung jury voting ten to two in favor of acquittal.
[2] Defendant challenges thirteen comments in closing, only four of which drew objections below.
[3] Upon arrest, defendant was sixteen years old, approximately five feet eight inches tall and weighed 165 pounds.
[4] Forensic evidence showed the murder weapon was actually a .38 special revolver, not a semi-automatic.
[5] Florida Standard Jury Instruction in Criminal Cases 2.04(e) concludes as follows: "If you conclude the defendant's out of court statement was not freely and voluntarily made, you should disregard it."
[6] In addition to the defendant, the defense called defendant's mother, Patricia Grimes, as a witness. Mrs. Grimes testified that she had been home all day and had not received a call from the police until 11:30 or 11:45 p.m. on the night the defendant was interrogated. This contradicted the testimony of the police detectives who testified that efforts had been made to contact defendant's mother at home before the interrogation began. She further testified that immediately upon being notified by police of her son's arrest, she traveled to the police station arriving just after midnight. The Miranda rights waiver form was signed at 8:20 p.m., the formal statement concluded at approximately 11:45 p.m., and the defendant signed the statement at 1:30 a.m.

To bolster her testimony, the defense introduced the telephone records of the pay phone in the lobby of the police department. These records showed that Mrs. Grimes made several calls beginning at 12:06 a.m., including a collect call to her home to speak to her husband. She testified that during the time between these calls she repeatedly asked to see her son but was refused permission.
[7] The defense argued in closing, without objection from the state, that on August 2nd, the day defendant was interrogated, the police believed the murder weapon was a semi-automatic firearmeither a .380, 9mm or .25 caliber. It was not until October 15th that they discovered that the murder weapon had been a .38 special (revolver). In addition to this, at one point during the confession defendant was asked why he had gone along with the robbery. His alleged response was "low self-esteem." Defense counsel argued that this was not the type of answer defendant would give if speaking in his own words.
[8] Detective Villaverde testified that he advised defendant that Officer Barnabe was there as a substitute for his parents. Indeed, at one point Villaverde was asked: "In your mind, Detective Barnabe was equivalent to having one of Eddie's parents there, yes or no?" His response was, "yes." Barnabe testified that during the pre-interview he explained to defendant that he was there to make sure that nobody pressured or threatened defendant. He further testified as follows:

Q: You were there in lieu of the parent, right?
A: That's correct.
Q: You were there as a substitute for Eddie's parent?
A: As a substitute?
Q: Uh-huh.
A: In place of the parent, yes.
The state called Sgt. W. Everette during its case in chief. This was apparently done so as to elicit testimony about certain standard operating procedures in the homicide unit concerning the taking of confessions from juveniles. On cross-examination Sgt. Everette was asked:
Q: Well, should the juvenile be told that, for instance, that a juvenile officer is there to protect his rights?
A: No.
Q: Okay. And should the juvenile officer tell him, look, I am here as a substitute for your parents?
A: No.
[9] We do not suggest that an eyewitness identification and a confession cannot constitute sufficient evidence to persuade us that any error in closing argument might be harmless beyond a reasonable doubt. We state simply that this is not the situation in the present case.