829 So.2d 280 (2002)
Rigoberto PERDOMO, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D00-899.
District Court of Appeal of Florida, Third District.
October 9, 2002.
Rehearing Denied November 8, 2002.
*281 Bennett H. Brummer, Public Defender, and Bruce A. Rosenthal, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, and John D. Barker, Assistant Attorney General, for appellee.
Before GREEN, SHEVIN and RAMIREZ, JJ.
SHEVIN, Judge.
Rigoberto Perdomo appeals judgments of convictions for attempted first degree murder, sexual battery, armed robbery and armed burglary with an assault. We remand for a limited evidentiary hearing on the qualifications of the state's expert to testify as to the population frequency statistics of the DNA match.[1]
The crimes occurred when a man entered the victim's home through a window at approximately 5:00 a.m.: he sexually battered, robbed and attempted to kill her. The victim was unable to see the perpetrator when he was in her home. Perdomo was arrested and charged with the crimes based on DNA test results which showed that his DNA sample matched the DNA obtained from the victim's semen-stained nightgown. The state presented the testimony of Victor Alpisar, a Miami-Dade Police Department Crime Laboratory supervisor, as an expert on DNA analysis.
In describing his qualifications, the witness stated that he has a Bachelor of Science in Biochemistry; he received training at the Miami-Dade Police Department; he took masters level courses in forensic DNA analysis at Florida International University and at the FBI Academy; he is an FIU Adjunct Professor of forensic serology and DNA analysis; he attends and lectures at scientific meetings involving forensic analysis; he reviews journals in his field; and that he is a member of the International Society for Forensic Genetics and the Southern Association of Forensic Scientists. He stated that he has conducted DNA analyses hundreds of times and that he has always been accepted as an expert in court proceedings. At the time of trial, he was the supervisor of fifteen scientists in the analytical section of the Miami-Dade Police Department Crime Laboratory.
*282 After Alpisar testified as to the biochemical DNA testing results, Perdomo objected to Alpisar's qualifications to testify as to the statistical analysis of the DNA match stating that Alpisar was not a statistician or a mathematician.[2] The court sustained the objection pending the state's showing of a predicate for the admission of the testimony. The state questioned the witness as to how he established the significance of the match in his experience and training. Alpisar stated that he used the Miami-Dade Police Department database in which DNA profiles, obtained from the known blood samples of 1200 individuals, were entered into a computer database. The database, which has been favorably reviewed by outside specialists, enabled him to estimate the DNA's frequency in the Dade County population. He described the frequency as "an estimate I give you so you can assess what is the likelihood that there might be someone else who also has this same profile." Alpisar stated that the statistical significance was determined by looking at the genetic information, determining the percentages of population that have that DNA and "tally[ing] up all the percentage for all the genetic elements that we examine." This method results in a "composite number that says [that] the profile .... can be found in only one out of so many people in the population." As to his qualifications to testify about population frequency statistics, Alpisar stated that he ordinarily computes the statistical significance of the match in the course of performing DNA analysis; that he is trained to do so; and that such training was included in the previously described education and experience. The court made no further inquiry into Alpisar's qualifications and summarily overruled Perdomo's renewed objection that Alpisar was not a statistician or mathematician.
Alpisar then testified that he used a database representative of Miami-Dade County, and created by the Miami-Dade Police Department. The database, which has been reviewed by outside experts, consists of 1200 samples, and is divided into three racial and ethnic groups: African-American, Caucasian and Hispanic. Alpisar determined that defendant's DNA profile can be expected to be found in the Dade County population in a frequency that ranges between 1 in 11 million and 1 in 90 million.
The jury found Perdomo guilty of the charged offenses. On appeal, Perdomo contends that Alpisar was not properly qualified to testify as to the statistical analysis of the DNA match; he argues that Alpisar was not a mathematician or statistician; was not involved in the formation of the database, and did not know the statistics as to the male and female population of Dade County. We agree to the extent that the record fails to show that Alpisar was properly qualified to testify as to the statistical significance of the match.
"DNA testing requires a two-step process, one biochemical and the other statistical. The first step uses principles of molecular biology and chemistry to determine that two DNA samples look alike. The second step uses statistics to estimate the frequency of the profile in the population." Butler v. State, 27 Fla. L. Weekly S461, S464, ___ So.2d ___, ___, 2002 WL 926283 (Fla. May 9, 2002). It is well-settled law that a properly qualified expert must testify as to "the qualitative or quantitative estimates demonstrating *283 the significance of the [DNA] match." Brim v. State, 695 So.2d 268, 270 (Fla. 1997). See Butler, 27 Fla. L. Weekly at S461, ___ So.2d at ___; Darling v. State, 808 So.2d 145 (Fla.2002); Murray v. State, 692 So.2d 157 (Fla.1997); Hayes v. State, 660 So.2d 257 (Fla.1995). It is not mandated that the witness be a statistician or a mathematician to be qualified to testify as an expert on the statistical significance of a match. See Butler; Darling, 808 So.2d at 158. See also Fay v. Mincey, 454 So.2d 587, 595 (Fla. 2d DCA 1984) (observing that it is "well-established that an expert does not need a special degree or certificate in order to be qualified as an expert witness in a specialized area," but "can be qualified by his `experience, skill and independent study of a particular field'")(quoting Salas v. State, 246 So.2d 621, 623 (Fla. 3d DCA 1971)). In addition, a witness may testify as an expert absent participation in the formation of the database, if the witness demonstrates "a sufficient knowledge of the authorities pertinent to the database." Murray, 692 So.2d at 164; Butler.
In Darling, the defense contended that the expert was unqualified as he was not a mathematician or statistician. The Court disagreed and held that the expert was properly qualified to testify as to population frequency statistics where "the expert testified regarding the general acceptance in the scientific community of the methodology used, and demonstrated his knowledge and experience regarding both the methodology and the databases employed." Darling, 808 So.2d at 158. In Butler, the Court rejected defendant's argument that Dr. Eberhardt, an expert who was not involved in the creation of the database or trained in statistics, was unqualified to testify as to the population frequencies. The Court held that the expert was qualified where "she was familiar with the samples from which the database was created[; the FDLE conducted validation studies of its own on the database she used; and] her training consisted of conducting `revalidations' of those databases." 27 Fla. L. Weekly at S464, ___ So.2d at ___.
In this case, we recognize that Alpisar explained the significance of the DNA match; his testimony "demonstrate[d] to the jury what segment of the population the profile was more likely to match." Id. However, we are unable to discern from Alpisar's testimony concerning his education and experience, the database and the methodology used to compute the frequency statistics whether he demonstrated the requisite knowledge, comparable to the expert witnesses in Darling or Butler.
As to his education and practical experience in DNA frequency computation, Alpisar merely stated that he ordinarily calculates the frequency statistics in the DNA analysis and his statistics training was included in the DNA analysis education he had previously described. He did not delineate the portion of his education or practical experience that was dedicated to this segment of DNA analysis. Therefore, the court is required to speculate as to the extent of his experience in statistical analysis. See Hudson v. State, 820 So.2d 1070 (Fla. 5th DCA 2002).
Although it is "not absolutely necessary for an expert witness to demonstrate practical experience in the field in which he will testify," his testimony as to the database employed "must, at the very least, demonstrate a sufficient knowledge of the database grounded in the study of authoritative sources." Murray, 692 So.2d at 164. Alpisar's testimony does provide some basis for concluding that his education included a study of the database, and he did testify as to the makeup of the database but the testimony is too limited to demonstrate knowledge of the database *284 sufficient to show that he is a qualified expert. See Hudson, 820 So.2d at 1072-74; Miles, 694 So.2d at 151. Cf. Butler, (expert's training involved "revalidations" of database); Darling, (expert demonstrated knowledge and experience regarding database employed).
As to Alpisar's knowledge of the methodology, the state contends that the witness used the product rule, which is generally accepted by the scientific community, to establish the frequency of defendant's DNA pattern. See Butler, 27 Fla. L. Weekly at S464, S466 n. 6, ___ So.2d at ___, ___ n. 6 (holding that the product rule is generally accepted and describing how that method works). Although Alpisar gave a general description of the method he employed, he did not expressly state that he used the product rule, nor is his testimony adequate to deduce that he used that method. We decline the state's invitation to theorize whether Alpisar "seemed" to employ the product rule method. See Hudson, 820 So.2d at 1070; Miles v. State, 694 So.2d 151 (Fla. 4th DCA 1997). Accordingly, the trial court erred in concluding on this record that the witness was qualified and in admitting his testimony as to the statistical significance of the DNA match.
As the DNA evidence was the main evidence against Perdomo, other than the victim's general description of the perpetrator and the police sketch, the error in admitting the DNA statistical analysis testimony was not harmless. Accordingly, we remand for a limited evidentiary hearing. See Hudson, 820 So.2d at 1070; Miles, 694 So.2d at 153. See also Arnold v. State, 807 So.2d 136 (Fla. 4th DCA 2002).
On remand, the trial court shall conduct an evidentiary hearing to assess Alpisar's competence to present the statistical evidence; as part of that inquiry the court shall determine whether Alpisar used the accepted product rule method to calculate the DNA statistics.[3] Following the hearing, the trial court shall enter an order ruling on the expert's qualifications and on whether Perdomo's convictions stand or he is entitled to a new trial.
Remanded.
GREEN, J., concurs.
RAMIREZ, J. (concurring in part, dissenting in part).
I concur with the majority that we should remand for a limited evidentiary hearing on the issue of the admissibility of the DNA statistical evidence. I write separately because I believe that we should reverse the conviction since the closing arguments by the State would alone provide grounds for reversal.
Shortly into his rebuttal closing argument, the prosecutor began attacking defense counsel's ethics:
[State]: I have to respond to something [defense counsel] said because I think it really does touch on the heart of what you just heard him say in the last thirty minutes. He talked about my obligation, the obligation of prosecutors and he's right. The obligation of prosecutors is to prosecute a case, to obtain the truth, not to obfuscate the truth, not to hide the truth, to make sure that the guilty get punished and that the innocent gets set free. And as infuriated as I am at [defense counsel]'s arguments to *285 you today, I don't blame him. You know why? Because he's got a different ethical obligation than I do. His rules require him
[Defense counsel]: Judge, I object. That is highly, highly uncalled for.
[The Court]: All right. Overruled, in light of your argument.
[State]: His rules are not the prosecutor's rules. His code of ethics require him to act in the best interest of his client. And I don't blame him for that. That's what a defense lawyer is. But you have to look at the arguments he's making. And I don't even have enough time to go through them all because he threw them all on the wall for you ...
What did we hearwhat did we hear in opening statement? Rush to judgment. I practically fell over in my chair. A rush to judgment? What is this, OJ revisited? All the OJ arguments come back out again. Every time there's DNA.
[Defense counsel]: Judge, I object. I object. Improper argument.
[State]: There's sort of OJ argument.
[The Court]: Overruled.
[State]: Some sort of OJ argument. We heard them all today, too. DNA is bad, not convincing. The witnesses are lying. Star witnesses [not] telling the truth and concealing things. Rush to judgment. Rush to judgment? It took a year to process the blood sample. That's a rush to judgment? I thought he was going to say if it doesn't fit, you must acquit.
[State]: Judge, I'm objecting again.
[The Court]: Overruled.
[State]: He said in his closing argument the match doesn't fit. That's what he said ...
* * *
The original sketch? Believe me, members of the jury, this would not have come into evidence if a proper predicate had not been laid. You remember hearing those objections at whatever point, predicate, predicate. Know what predicate is? Predicate is a legal principle by which you establish the legal liability.
[Defense counsel]: Objection. That's a misstatement of what predicate is.
[The Court]: All right. Overruled.
The prosecution's comparison of its duty as being "to obtain the truth, not to obfuscate the truth, not to hide the truth, to make sure that the guilty get punished and that the innocent gets set free" in relation to the defense attorney's role to "act in the best interest of his client" was highly improper. See Ruiz v. State, 743 So.2d 1, 5 (Fla.1999). Attacks on the defense or on defense counsel are also improper. See Lewis v. State, 780 So.2d 125, 130 (Fla. 3d DCA 2001). See also Lewis v. State, 711 So.2d 205 (Fla. 3d DCA 1998).
Additionally, the comparison of the defense to that used in the infamous O.J. Simpson case was unjustifiable and improper. See DeFreitas v. State, 701 So.2d 593, 601 (Fla. 4th DCA 1997). Judge Pariente concurred in reversal upon a similar comment, also coupled with other improper comments, stating: "[the] comparison with the O.J. Simpson trial simply had no place in this case." Id. at 606. See also Ryan v. State, 457 So.2d 1084 (Fla. 4th DCA 1984) (condemning the prosecution's comparison to the Patty Hearst case). In this case, the comparison to the O.J. Simpson case was far more pointed and provocative than in DeFreitas.
Lastly, the description of the predicate of the police sketch as "a legal principle by which you establish the legal liability," rather than merely as the basis of admissibility, was obviously incorrect, improper, and an impermissible bolstering of evidence. As a general matter, bolstering by *286 a prosecutor is improper enough, e.g., Lewis v. State, 780 So.2d at 130, but this was a particularly unjustifiable form of bolstering, asserting that the fact of admissibility established "the legal liability." Unfortunately, the trial court reinforced these arguments when it overruled the objections despite its ability to make proper rulings and give curative instructions.
I believe that these improper arguments were not harmless in light of the fact that DNA evidence was the only incriminating evidence against Perdomo.
NOTES
[1] As to the closing argument, we find that the prosecutor's cited statements do not require a new trial. The misstatement of the law during closing argument was harmless. See Almeida v. State, 748 So.2d 922, 927 (Fla.1999). The prosecutor's reference to O.J. Simpson trial, while ill-advised, did not characterize defendant as O.J. Simpson. Cf. DeFreitas v. State, 701 So.2d 593, 601 (Fla. 4th DCA 1997)(comparison of case to O.J. Simpson case "coupled with reference to [defendant] as a stalker, possessive ex-boyfriend who disapproved of his ex-girlfriend's friends" violated rule of inflammatory argument). Finally, the comparison of the prosecutor's and defense counsel's duty in response to defense counsel's closing, when considered in context, does not amount to an argument similar to that in Ruiz v. State, 743 So.2d 1 (Fla.1999). See Craig v. State, 685 So.2d 1224, 1229 (Fla.1996) (Prosecutor represents sovereignty "whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.") (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).
[2] Perdomo did not object to Alpisar's testimony as to the first step of DNA testing which found that Perdomo's DNA sample matched the DNA obtained from the crime scene evidence.
[3] If Alpisar used a different methodology, the court shall determine if that methodology is generally accepted. We acknowledge the state's contention that Perdomo did not object to the statistical methodology used. However, a determination of the expert's qualifications vel non permits such an inquiry. See Darling, 808 So.2d at 158; Hudson, 820 So.2d at 1074.