937 So.2d 590 (2006)
William TAYLOR, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-2243.
Supreme Court of Florida.
June 29, 2006.
*592 Marion Moorman, Public Defender, and Andrea M. Norgard, Special Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a corresponding sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence of death.

FACTS AND PROCEDURAL HISTORY
On August 25, 2001, a grand jury returned an indictment for appellant William Taylor on one count of first-degree premeditated murder for the murder of Sandra Kushmer, one count of attempted first-degree murder for the attempted murder of William Maddox, one count of robbery with a deadly weapon, one count of robbery with a firearm, and one count of armed burglary of a dwelling.
At trial, Renata Sikes established that on Friday, May 25, 2001, she, along with her daughter Sandra Kushmer and her son William Maddox, went to visit her husband in the hospital. Kushmer and Maddox left the hospital in a rental car. At approximately 10:30 p.m. that night, Sikes called her home and spoke to Kushmer, who advised that "Ken" was there with Kushmer and Maddox,[1] and, according to Sikes, it sounded as though she was having fun. Thirty minutes later, Sikes again called home to inform her children that she would remain at the hospital, but there was no answer. Sikes called her home repeatedly thereafter, but the calls were never answered. At approximately 3:30 p.m. on Saturday, May 26, 2001, Sikes returned home. Upon arriving, Sikes noticed that the rental car was gone, and she observed blood on the outside of her house. In addition, Sikes discovered her daughter's medication, purse, and shoes *593 lying outside on the ground. Upon entering the house, Sikes found Kushmer lying in a puddle of blood. As Sikes walked further into the house, she discovered Maddox lying on the bed in a back bedroom. Sikes observed that Maddox's face was black and blue, his pillow black with blood, but he was still alive. Sikes later determined that cameras belonging to her husband which had been stored in the closet of Maddox's room were missing.
Cynthia Byrnes was working at Harry's Country Bar on the night of Friday, May 25, 2001, the night of these events. She saw Kushmer and Maddox enter the bar that night, while Taylor was also present. According to Byrnes, Maddox was drinking the most expensive liquor sold at the bar, paying for his drinks with twenty-dollar bills, and leaving good tips. Byrnes testified that Maddox, Kushmer, and Taylor left the bar together.
On Saturday, May 26, 2001, Tommy Riley awoke to see Taylor on his doorstep. Later that morning, Taylor asked Riley to cash a $580 check, but Riley refused. The name on the two-party check was William Maddox, and it was from a bank in California, where Maddox lived. Later that evening, Taylor was in a bar where Riley worked as a bartender, paying for drinks with twenty-dollar bills. The following morning, Sunday, May 27, 2001, Riley was advised by an employee at Harry's Bar, where Taylor, Kushmer, and Maddox had been the night of the murder, that detectives were looking for Taylor. Riley conveyed this information to Taylor, and he immediately left Riley's house in his pickup truck.
The detective in charge of investigating these crimes obtained information that Maddox's credit cards had been used in Tampa, Florida; Valdosta, Georgia; and Memphis, Tennessee. Based on this information, she contacted the United States Marshal's Office in Tampa, which then relayed the information to the Marshal's Office in Tennessee. Deputy Marshal Scott Sanders of the Memphis office received the information on May 29, 2001, from the Tampa office that two warrants for Taylor's arrest for federal probation violations were outstanding and that Taylor might be in the Memphis area because he was believed to be in possession of credit cards that were being used in that location.
The Tennessee marshals located Taylor's pickup truck at a motel, and he was taken into custody. Sanders wanted to search Taylor's motel room at that time but he was unable to do so because he could not locate a Marshal's Office consent form. He then obtained a consent form from the Shelby County Sheriff's Office, added the words "and the U.S. Marshals Office" to the top of the form, and filled it out, writing in the motel name and the room number to be searched. Sanders explained the form to Taylor and told him the consent form was for his motel room. According to Sanders, Taylor did not express any hesitation in signing the form.
The search of Taylor's room revealed a checkbook wallet containing checks in the name of Bill Maddox, three credit cards issued to Maddox, credit card receipts, a ticket from a pawn shop in Memphis, a Discover credit card issued to Sandra Kushmer, and a Texaco card issued to Barry Sikes, which Renate Sikes testified she had given to Kushmer. Receipts dated May 29, 2001, indicated that the Maddox credit card had been used to purchase a gold chain and a wedding band. The pawn shop ticket with the same date indicated that Taylor had pawned the two items.
When the lead Florida detective met with Taylor in Tennessee on May 30, 2001, she asked him for consent to search his truck. She read the applicable consent to *594 search form to Taylor and he signed it. Taylor was then presented a consent to interview form which he also signed. The interview revealed that on Friday, May 25, 2001, Taylor called Kushmer and arranged a meeting at Harry's Bar. Taylor disclosed that early that evening, he encountered an unnamed individual who lived near the bar, and he told this individual that he (Taylor) wanted to rob the Sikes home. This other person also had an interest in participating in the crime. Later that evening, Maddox and Kushmer left the bar with Taylor and they went to the Sikes home. Taylor confirmed that after the trio had beer and sandwiches, Taylor and Kushmer left the house and traveled to another bar, where they remained until approximately 12:30 a.m. They then returned to the Sikes home. When they arrived, the individual with whom Taylor had previously discussed the crime was in the driveway. This individual struck Kushmer on the back of the head with a long black bar. Kushmer fell to the ground, and Taylor removed two credit cards from her purse. Taylor admitted that he then went into the Sikes home and discovered Maddox lying in a puddle of blood. Taylor described the scene as the other unnamed individual in the bedroom going through the dresser drawers and a jewelry box. According to Taylor, his partner in this crime heard a noise, checked outside, and advised Taylor that Kushmer was now sitting up against the house. Taylor stated that this other individual then took a shotgun that was leaning against the wall, telling Taylor, "I'm just going to hit her with it." While Taylor was removing the bag containing cameras from Maddox's room, he heard a gunshot and went to the back of the house, where this other individual stated that he had shot Kushmer. Taylor then carried Kushmer into the house and placed her on the floor. Taylor then fled from the scene in his truck. The next morning, Taylor and Jose Arano went to Ybor City. Taylor said it was in a bar there that he used Maddox's credit cards to pay for drinks, and a card was also used to purchase food.
The day after the interview, the lead Florida detective searched Taylor's truck and found a black bag on the floorboard which contained cameras and camera accessories. The detective presented these items to Sikes, who identified them as belonging to her husband. The detective then went to a bar in Memphis at which Taylor had used the Maddox credit cards and spoke with Pamela Williams, who disclosed that Taylor had purchased drinks for her at the bar on the night of May 28, 2001, and introduced himself to her as William Maddox. She also showed the detective a note given to her by Taylor which he signed as "Bill Maddox" and identified himself as the owner of his own financial corporation.
After speaking with Williams, the detective returned to interview Taylor again. When Taylor was advised by the detective that she did not believe everything he had related the day before, Taylor told her the interview was over. However, Taylor continued to speak, and at one point, he said, "I shot her." The detective inquired if Taylor understood that he had terminated the interview and whether he wished to continue. Taylor replied that he did wish to continue. Taylor then changed his prior version of the events and stated that after Kushmer had been hit by the unnamed individual with him, Taylor armed himself with a shotgun from his truck. Taylor then stated that after he had burglarized the house and as he was leaving, he saw a movement and fired the shotgun in that direction. Taylor described that when he discovered that he had shot Kushmer, he carried her inside the house, placed her on the floor, threw the gun in the back of his truck, and immediately left. Taylor then *595 stated that he pawned the shotgun and threw the clothes he was wearing in a dumpster.
Almost a month later, the lead Florida detective was informed that Taylor wished to again speak with her at the jail. When she arrived, Taylor gave the detective a letter that he had written which stated that during the earlier interviews, the detective had been "absolutely correct in [her] constant believing in the [unidentified] person being [Jose Arano]." According to his letter, after Arano picked up Taylor's ex-wife, Lorena, Taylor instructed him to go to the Sikes home and hide in front of the house with Lorena. Taylor's letter disclosed that as Taylor and Kushmer approached the front of the house at approximately 1:20 a.m., Lorena came from her concealment and hit Kushmer with a crowbar. Taylor then removed Kushmer's keys from her purse, the three of them entered the Sikes home, and Taylor retrieved the shotgun from his truck. Taylor's letter stated that it was Arano who had beaten Maddox with the crowbar. According to the letter, Lorena then heard a noise outside. As Taylor went outside, someone turned the corner, and Taylor fired the gun in that direction. When he realized that it was Kushmer, he brought her inside the house. Taylor took the cameras, a couple of watches, and the keys to the rental car. Taylor and Arano drove away from the Sikes home in separate vehicles (with Lorena riding in Taylor's truck), and Taylor threw the car keys for the rental car in a ditch. The three stopped at a 7-11, where Arano cleaned the crowbar and placed it in Lorena's car. Taylor gave Lorena the money and the watches and advised her to go to Miami.
The medical examiner, Dr. Lee Miller, testified that the cause of Kushmer's death was a shotgun wound to the head that penetrated her arteries and veins, which caused her to bleed to death. Based on the available evidence, at the time of the shooting the shotgun had been pressed against Kushmer's mouth. The wound path was consistent with Kushmer having been in a sitting position. The medical examiner was of the opinion that Kushmer's wound was inconsistent with being shot by a person standing in the doorway of the house as she appeared around the corner. Additionally, the laceration on the back of Kushmer's head was consistent with being struck by the butt of a shotgun.
A blood spatter expert opined that the blood smears on the outside wall of the Sikes home were likely caused by Kushmer's bloody hair. Further, high-velocity blood spatter located to the left of the smears indicated that the spatter was caused by a gunshot wound. The impact site was consistent with a victim who had been shot in the mouth while sitting or kneeling at the time. The blood patterns inside the Sikes home were consistent with Kushmer's body having been carried into the home and swung in an arc-like manner before being dropped on the floor.
Latent fingerprints were lifted from beer bottles found in the garbage at the scene. A fingerprint expert matched one latent fingerprint with the known print of Taylor's right index finger. The Hillsborough County Sheriff's Office collected the shotgun and the pawn ticket from the shop where Taylor had pawned the item. A different fingerprint examiner was of the opinion that a thumbprint on the pawn ticket from the shotgun transaction also matched the known fingerprints of Taylor. The Florida Department of Law Enforcement tested the shotgun, and two areas tested positive for blood. DNA testing on the blood from these two areas generated partial DNA profiles that matched the profile of Maddox at three and four genetic points.
*596 After hearing the evidence, the jury rendered a verdict finding Taylor guilty of first-degree murder as to the death of Kushmer, attempted first-degree murder as to William Maddox, robbery with a deadly weapon as to Maddox, robbery with a firearm as to Kushmer, and armed burglary of a dwelling. During the penalty phase, the State presented the testimony of the victims of crimes from Taylor's prior convictions for burglary, first-degree assault, and possession of a deadly weapon during the commission of a felony, who described the circumstances surrounding the crimes. The parties also stipulated that at the time of the murder, Taylor was on federal felony probation. Victim impact statements prepared by Renate Sikes, William Maddox, and William Maddox, Sr. (Kushmer's father) were read to the jury.
During the penalty phase, the defense presented videotaped depositions of three witnesses and live testimony from three additional witnesses. Taylor's maternal aunt disclosed that his stepfather physically and mentally abused him and beat his mother. Josephine Quattrociocchi, who met Taylor in prison while visiting another inmate, was of the view that Taylor was a sincere and nice person. Taylor worked as a painter at one time, and his employer summarized that Taylor was an excellent worker, had initiative and a good work ethic, his work product was good, he could follow special instructions, and he did not require excessive supervision. A former counselor at Glades Correctional Institution informed the jury that Taylor had completed a drug program that he operated, and afterwards Taylor became a facilitator who assisted inmates in the drug program.
The defense also presented mental health experts. One diagnosed Taylor as suffering from a cognitive disorder, with deficits related primarily to the frontal lobe. He also opined that Taylor met the criteria for Antisocial Personality Disorder and most of the criteria for Borderline Personality Disorder. This expert also noted that Taylor himself and medical reports indicated that Taylor suffered a traumatic brain injury by falling from a scaffold in or around 1981, and after that, Taylor began to have headaches and seizures. This expert ultimately concluded that Taylor has a chronic emotional disorder; i.e., frontal lobe syndrome, which was aggravated or exacerbated on the night of the murder by Taylor's extensive consumption of alcohol. Due to the circumstances of that evening and Taylor's frontal lobe syndrome, his judgment was compromised to the extent that his ability to conform his conduct to the requirements of the law was impaired.
A second expert diagnosed that Taylor had presented brain dysfunction in the form of frontal lobe impairment and evidenced impairment with regard to the formulation of intent and impulse control. He concluded that Taylor suffered from epilepsy, which is consistent with a traumatic brain injury, based on the history that Taylor relayed and the medical records which detailed Taylor's response to the antiseizure medication Dilantin.
A State expert responded to this mental health evidence and concluded that Taylor met the criteria for both Borderline and Antisocial Personality Disorders. In his view, while Taylor may have suffered seizures after the head injury that Taylor claimed to have suffered, there was no indication of a permanent seizure disorder. The State expert found no evidence of frontal lobe or temporal lobe impairment in Taylor, and he concluded that Taylor's reported head injury in the 1980s did not result in any permanent brain damage. This expert concluded that on the night of the murder, Taylor did not suffer from any *597 mental disease or defect that substantially impaired his capacity to appreciate the criminal nature of his conduct or his ability to conform his conduct to the requirements of the law.
After consideration of the evidence, the jury returned a recommendation of death by a vote of twelve to zero. During the Spencer[2] hearing, a defense mental health expert estimated that Taylor consumed ten beers and eight ounces of tequila and had smoked two or three marijuana joints on the day of the murder. He testified that Taylor's poor performance on tests that measure frontal lobe function was strongly indicative of frontal lobe damage and his neuropsychological deficits were more likely developmental in nature and likely preceded the head injury that Taylor suffered in the 1980s.
The trial judge sentenced Taylor to death for the murder of Kushmer. In pronouncing Taylor's sentence, the trial court determined that the State had proven the existence of three statutory aggravators: (1) the murder was committed while Taylor was on felony probation, see § 921.141(5)(a), Fla. Stat. (2001); (2) Taylor had previously been convicted of a felony involving a threat of violence to the person, see § 921.141(5)(b), Fla. Stat. (2001); and (3) the murder was committed for pecuniary gain, see § 921.141(5)(f), Fla. Stat. (2001). The trial court assigned each of these factors great weight. The court did not find that any statutory mitigators existed, but found a total of thirteen nonstatutory mitigating circumstances, two of which were assigned modest weight, six were assigned some weight, two assigned little weight, and three were assigned minimum weight.[3] In imposing a sentence of death, the trial court concluded that "[t]he aggravating circumstances in this case far outweigh the mitigating circumstances."
This direct appeal followed.

ANALYSIS

Guilt Phase[4]
In his only challenge to the guilt phase proceedings, Taylor asserts that the trial court erred in denying his motion to suppress the evidence that was obtained as a result of the search of his motel room in Memphis. In this motion, Taylor alleged that the evidence was seized without a warrant and as the result of an illegal search because he believed that the consent *598 form he signed was only permission to search his truck.
We have stated that "[a] trial court's ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Connor v. State, 803 So.2d 598, 605 (Fla.2001) (quoting Murray v. State, 692 So.2d 157, 159 (Fla.1997)). Nevertheless, "mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." Id.
At the suppression hearing, there was a dispute in the evidence with regard to the consent to search form that Taylor signed. Taylor testified that when the deputy marshal provided the consent form, it had no handwriting, and he believed that the consent was only for a search of his truck. According to Taylor, when the deputy marshal presented him with the form:
They read it to me and asked me would I sign it so they could take my pickup away because they needed to get inside and take stuff out, they needed to get evidence out of the pickup truck, and I said, yes, I'll sign the warrant to take the evidence out of the pickup truck.
Taylor thought the form was only for a search of his truck because when he was initially taken into custody, officers went into his room at that time to search for other individuals. On cross-examination, Taylor testified that he never questioned why the consent to search form that he was asked to sign was blank. However, he also admitted that he was familiar with such forms because he had been arrested approximately four times in the past. Taylor conceded that he did not question why the Florida investigator requested that he sign a consent form to search his truck the next day (even though he believed he had already consented to a search of the truck), nor did he question the propriety of the search of his room when the Florida officer advised him that evidence had been found there.
The Tennessee deputy marshal, who at the time of trial had been employed with the Marshal's Office for eighteen years, offered a different account of the events. He testified that after he obtained a consent form from the Shelby County Sheriff's Office, he "filled [it] out and then talked with Mr. Taylor and explained the form to him and asked for permission to search the room." The deputy marshal stated that he read the form to Taylor line-by-line, including the handwritten additions, and testified at the suppression hearing that this has been his standard practice for years. He stated that he was not interested in searching the vehicle at that time because "[Florida officials] would be processing it for . . . evidence . . . . [W]e knew it was going to be secured and it would be searched at a later time." The deputy marshal did not believe there had been any discussion concerning a search of the vehicle at that time; at most, he may have asked Taylor if there were any narcotics or weapons in the truck. A second deputy marshal observed the reading of the consent form to Taylor, watched Taylor sign the form, and also signed the form.
The trial court ultimately found "the consent to search was signed freely and voluntarily" and denied the motion to suppress based on the following facts: (1) the deputy was a veteran supervisor of the Marshal's Office; (2) Taylor's claim that the form was blank at the time it was read *599 to him "ma[de] no sense"; (3) Taylor's familiarity with consent to search forms; (4) Taylor's failure to question the signing of a second consent to search form for his truck; and (5) Taylor's failure to object when the Florida officer stated that evidence had been recovered from his room. The trial court specifically found the deputy marshal's testimony to be credible.
This Court "recognize[s] and honor[s] the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position `to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses.'" Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999) (quoting Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976)). During the suppression hearing, the trial court considered the conflicting testimony of Taylor and the deputy marshal, observed their demeanor, and concluded that the testimony of the deputy marshal was more credible. We conclude that these findings of historical fact are supported by competent, substantial evidence, and we defer to the conclusion that Taylor gave free and voluntary consent to search his motel room. Therefore, we hold that the trial court did not err in denying the motion to suppress. See Jorgenson v. State, 714 So.2d 423, 426 (Fla.1998) (concluding that "a search will be considered lawful if conducted pursuant to consent which was given freely and voluntarily").

Penalty Phase

I. Jury Instructions
Taylor asserts that Florida's standard jury instructions are unconstitutional for two reasons. He first claims that the instructions unconstitutionally shift the burden of proof to the defendant by instructing that the jury has the duty to recommend a sentence based on whether sufficient mitigating circumstances exist to outweigh any existing aggravating circumstances. Taylor further claims that Florida's standard jury instructions unconstitutionally minimize and denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by repeatedly advising the jury that its verdict is only advisory and informing the jury that the decision as to sentence rests solely with the court. We reject both of these assertions.
As to the first challenge, this Court has repeatedly rejected the argument that the standard penalty phase jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence. See, e.g., Elledge v. State, 911 So.2d 57, 79 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002). Further, despite this challenge to the standard jury instruction, the trial judge in this case did not use the standard instruction. The trial court in preliminary proceedings informed the parties that she was going to use a modified instruction which informed the jury that only if the jury finds that the aggravating circumstances outweigh the mitigating circumstances could a sentence of death be recommended:
Court: I would intend to read an instruction that indicates only if the aggravators outweigh. In other words, it does away with the possibility of shifting the burden. You understand what I am saying?
State: I understand. But that's the standard instruction that I go off of.

*600 Court: The standard isn't going to get it, okay. This is a death penalty case. As far as I'm concerned, the standard is. . . it's extreme due process. So if there is a doubt as to which waywhat harm is it? That's really what you are asking them to do. The burden really is on the State.
Since the judge at trial did not read the standard jury instruction that Taylor asserts to be erroneous, but read an instruction that required the jurors to determine if the aggravators found outweighed the mitigators in rendering an advisory sentence, we conclude that Taylor's claim is without merit on this issue.
With regard to Taylor's Caldwell challenge, this Court has previously held that the standard jury instruction fully advises the jury of the importance of its role and does not unconstitutionally denigrate that role. See Brown v. State, 721 So.2d 274, 283 (Fla.1998) (citing Burns v. State, 699 So.2d 646, 654 (Fla.1997), and Johnson v. State, 660 So.2d 637, 647 (Fla. 1995)). This Court has also held that the decision in Caldwell is inapplicable to death penalty cases in Florida. See Combs v. State, 525 So.2d 853, 856 (Fla.1988).
Further, as with Taylor's first jury instruction challenge, the judge in this case did not give the standard jury instruction. Rather, at the beginning of the trial and in the actual jury instruction, the judge repeatedly informed the jury that great weight would be given to its recommended sentence. Even before voir dire, the court told the prospective jurors:
Now, it is the judge's responsibility to impose a sentence in any case, including a case involving murder in the first degree. However, howeverand this is important, I want you to hear me very carefullyin a case where a jury makes a recommendation of a sentence of either life or death, it is only under very, very rare circumstances where a Court would impose a sentence other than the one recommended by the jury.
I'm going to repeat that. Although it's the judge's job, in any case, to sentence a defendant, in any case, in a case involving the charge of murder in the first degree where a jury is called upon to make a recommendation as far as sentencing is concerned, it is only under the very rarest of circumstances when a judge would not follow the jury's recommendation.
During the penalty phase, the judge instructed the jurors as follows:
As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the judge.
However, your advisory sentence must be given great weight by the Court in determining what sentence to impose upon the defendant. And it is only under very rare circumstances that the Court could impose a different sentence.
The argument Taylor presents has been rejected by this Court, see Brown, 721 So.2d at 283, and the trial judge did not use the standard jury instruction; therefore, we conclude that this claim is similarly without merit.

II. Ring Claims
Taylor claims that the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), invalidated Florida's capital sentencing procedures. Taylor also argues that Ring requires that: (1) the recommendation of death be unanimous; (2) the aggravators be alleged in the indictment; and (3) the aggravators be individually found by a unanimous jury verdict.
This Court has rejected each of Taylor's arguments in prior decisions. In *601 Jones v. State, 845 So.2d 55 (Fla.2003), we rejected the claim that Florida's capital sentencing scheme violates the United States Constitution under Ring. See id. at 74 (citing Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002)). Furthermore, one of the aggravating factors found by the trial court in this case was a prior conviction of a violent felony, a factor "which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003).[5] Finally, this Court has rejected Ring claims in direct death appeals where the recommendations for the imposition of death were unanimous, as occurred in the instant case. See Crain v. State, 894 So.2d 59, 78 (Fla.2004), cert. denied, ___ U.S. ___, 126 S.Ct. 47, 163 L.Ed.2d 79 (2005).
Taylor's remaining challenges have already been rejected by this Court in prior decisions. See Parker v. State, 904 So.2d 370, 383 (Fla.2005) ("This Court has repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote . . . [and] has rejected claims that Ring v. Arizona . . . requires aggravating circumstances to be individually found by a unanimous jury verdict."); Brown v. Moore, 800 So.2d 223, 224-25 (Fla.2001) (rejecting constitutional challenge predicated on the failure to list aggravating factors in the indictment). Accordingly, we conclude that Taylor's claims are without merit.

III. Proportionality Review
Finally, Taylor asserts that the imposition of the death sentence for the murder of Sandra Kushmer is disproportionate because it constitutes one of the least aggravated and most mitigated of crimes. To ensure uniformity in death penalty proceedings, this Court conducts a comprehensive analysis to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, as we attempt to afford uniformity in the application of the sentence. See Floyd v. State, 913 So.2d 564, 578 (Fla.2005). Death is a unique punishment, and it is necessary that we engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances and to compare each case with other capital cases. This process is not a comparison between the number of aggravating and mitigating circumstances. See Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Further, despite Taylor's assertion to the contrary, the mere absence of the heinous, atrocious, or cruel, and the cold, calculated, and premeditated aggravators is not absolutely controlling as we conduct a proportionality analysis. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
The jury here recommended the death penalty by a vote of twelve to zero. The trial court found such punishment to be appropriate after considering all evidence and properly weighing the aggravation with the mitigation. In sentencing Taylor to death, the trial court found the following three statutory aggravators and gave each great weight: (1) Taylor had previously been convicted of a felony involving a threat of violence to the person; (2) the murder was committed for pecuniary gain; and (3) the murder was committed while Taylor was on felony probation.
With regard to the prior violent felony, the trial court found that Taylor had committed *602 two prior felonies that involved the use or threat of violence. At the age of seventeen, Taylor shot a woman in the neck and back through a window in her home while she was sitting at a table. Taylor's victim attempted to call her daughter for help, but she could not speak because her throat was filled with blood. She was forced to ultimately walk across the street to a neighbor's house to obtain assistance. In a second prior criminal incident, Taylor struck a female acquaintance in the face when she discovered Taylor burglarizing her room. In concluding that the latter crime qualified as an aggravating violent felony, the trial judge stated:
[T]his is not a run-of-the-mill, push-and-shove, get out of the way. He took his fist and shoved it in her face full force, evidently. . . . You know, her jaw could have been broken. Her neck could have snapped. . . . So as far as I'm concerned she was lucky. She was very, very lucky. . . .
In affording this aggravator great weight, the trial court noted that "each [of these] crime[s] definitely shows that at an early age and without provocation, [Taylor] acted violently toward others. Either crime standing alone, would have caused the Court to give this circumstance great weight." The trial court found the defense assertion that the crimes occurred twenty-seven years ago to be without major impact because "for approximately twenty-three of the last twenty-seven years [Taylor] has been confined."
In mitigation, the trial judge found the following thirteen nonstatutory mitigating factors: (1) Taylor was under some mental or emotional disturbance at the time of the crime (some weight); (2) Taylor suffered psychological trauma from abuse and neglect during his formative years (some weight); (3) Taylor suffered psychological trauma due to deprivation in parental nurturing (some weight); (4) Taylor's stepfather provided Taylor with no emotional or parental support (modest weight); (5) Taylor suffered from neurological impairments affecting his ability to control impulses (some weight); (6) Taylor suffered from learning disabilities, attention deficit problems, and problems with social interactions (some weight); (7) Taylor had obtained his GED in prison (minimum weight); (8) Taylor had made attempts to address and recover from his drug dependence (modest weight); (9) Taylor was a good worker and dependable employee (minimum weight); (10) Taylor agreed to be interviewed and cooperated with the police (minimum weight); (11) Taylor has a history of substance abuse dating back to his preteen years (some weight); (12) Taylor was under the influence of alcohol at time of crime (little weight); and (13) Taylor behaved appropriately during trial (little weight).
Having independently reviewed the totality of circumstances, we conclude that this case falls among the most aggravated of murders. The record conclusively demonstrates that Taylor was with Kushmer for a significant part of the evening of May 25, 2001, while he planned the crime. He drove Kushmer and Maddox home from Harry's Bar, and then proceeded to have drinks and food with them before going to another bar with Kushmer. From these actions, it is apparent that Taylor had secured Kushmer's trust and she considered him to be a friend. However, when they returned to the Sikes home, Taylor, who is six feet, three inches tall, incapacitated Kushmer, who was five feet, two inches tall, and weighed ninety-five pounds, by striking her on the back of the head with the butt of a shotgun. Kushmer was left unconscious outside the house as he proceeded to enter the home, savagely *603 beat Maddox with the shotgun as he slept,[6] and steal items from the residence. When Kushmer began to regain consciousness, Taylor could have easily fled the premises with Kushmer on the ground, injured, possibly intoxicated, and she posed no immediate threat. Instead, Taylor chose to place a gun against Kushmer's mouth and fire a shotgun into her head. After the murder, Taylor used the stolen credit cards to buy drinks for his friends and women at bars and to buy items that were pawned for quick cash. Taylor even identified himself at a bar as business owner Bill Maddox. Taylor had a history of violent felonies and, with the other aggravation, we conclude that this senseless and brutal murder falls under the category of the most aggravated of crimes, and it is not outweighed by the mitigation found to exist.
The cases advanced by Taylor to assert that the death penalty is disproportionate are clearly distinguishable. In Voorhees v. State, 699 So.2d 602 (Fla.1997), and Sager v. State, 699 So.2d 619 (Fla.1997), which involved codefendants to the same murder, we reversed the death penalty for each of the defendants in part because we concluded that the murder resulted from a spontaneous fight. See Voorhees, 699 So.2d at 605. We noted that both the victim and the defendants had been drinking and were intoxicated at the time of the incident. See id. at 615. In reversing the sentences, we reasoned that defendant Voorhees suffered from alcoholism and had an abnormal reaction to alcohol, see id., while defendant Sager suffered from mental illness, and "there was evidence that Voorhees was the leader of the two." Sager, 699 So.2d at 623. On the other hand, Taylor's actions prior to the murder of Kushmer were not part of a spontaneous confrontation, but rather were the result of a formulated plan by Taylor. Further, even though both Kushmer and Taylor had been drinking that night, the murder of Kushmer was not preceded by a spontaneous drunken fight.
The other cases upon which the defense relies are similarly distinguishable. Cf. Kramer v. State, 619 So.2d 274, 278 (Fla. 1993) (reversing death penalty where "[t]he evidence in its worst light suggests nothing more than a spontaneous fight, occurring for no discernible reason, between a disturbed alcoholic and a man who was legally drunk"); Terry v. State, 668 So.2d 954, 965-66 (Fla.1996) (reversing death penalty where murder resulted from a "robbery gone bad"; concluding that "the aggravation [was] not extensive given the totality of the underlying circumstances"). Instead, the instant case is significantly more analogous to Shellito v. State, 701 So.2d 837 (Fla.1997), wherein we affirmed the imposition of the death penalty. In Shellito, an eighteen-year-old defendant "saw a man walking down the street, stopped and shook him down, and, after determining that the man had no money, shot him." 701 So.2d at 839. In that case, the trial court found the aggravators of prior violent felony and pecuniary gain/murder committed during a robbery (which were merged). See id. at 840. In the instant case, the prior violent felony and pecuniary gain aggravators were also found to exist. Further, like the present case, the defendant in Shellito was on probation at the time he committed the murder. See id. at 845. Additionally, in concluding that the trial court in Shellito did not err in giving the defendant's claims of mental illness slight weight, we *604 noted that evidence of the defendant's mental condition was conflicting. See id. at 844. Likewise, in the instant case, the expert testimony conflicted as to whether Taylor suffered from frontal lobe impairment or a permanent seizure disorder.
In light of the foregoing, we hold that Taylor's death sentence is not disproportionate to other capital cases where death has been imposed.

CONCLUSION
Having received oral argument and thoughtfully considered each of the issues presented in this direct appeal, we affirm Taylor's convictions and the sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs with an opinion, in which ANSTEAD, J., concurs.
ANSTEAD, J., concurs as to the convictions and concurs in result only as to the sentence.
PARIENTE, C.J., concurring.
I concur in the majority opinion and write separately to commend the trial judge for using special instructions that gave jurors a better and more complete picture of their roles in the capital sentencing process than the standard instructions. However, I believe that under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), jurors should also be told that they are the finders of fact as to aggravating circumstances that qualify a defendant for the death penalty.
The trial court's instruction on the weight that the court would give the sentence recommendation was an improved elaboration on the standard instruction, which informs the jury that its recommendation would be an "advisory sentence" and that the final sentencing decision would rest solely with the judge. See Fla. Std. Jury Instr. (Crim.) 7.11. Echoing instructions given before voir dire, the judge acknowledged that the final sentencing decision rested with her, but added:
However, your advisory sentence must be given great weight by the Court in determining what sentence to impose upon the defendant. And it is only under very rare circumstances that the Court could impose a different sentence.
(Emphasis supplied.) This instruction correctly reflected the law concerning the jury's role and conveys to jurors the gravity of a death recommendation. See Tedder v. State, 322 So.2d 908, 910 (Fla.1975) (stating that jury recommendation should be given great weight and life recommendation should not be overridden unless "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ").
As noted by the majority, this Court has repeatedly rejected challenges to the standard instructions based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in which the United States Supreme Court ruled that a prosecutor's argument to a capital sentencing jury that its decision is reviewable and not final diminished the jurors' sense of responsibility in violation of the Eighth Amendment. However, the cases cited by the majority predate Ring. As Justice Lewis stated shortly after Ring, the standard penalty phase instructions in Florida may inaccurately reflect the Sixth Amendment role played by the jury in deciding whether the defendant lives or dies. See Bottoson v. Moore, 833 So.2d 693, 731-33 (Fla.2002) (Lewis, J., concurring in result only). In my view, and as I have stated before, trial judges should also inform jurors *605 that they are the finders of fact on aggravating circumstances. See Globe v. State, 877 So.2d 663, 680 (Fla.2004) (Pariente, J., specially concurring) (concluding that in light of Ring, "[a]t the very least, jurors should be told that they are the finders of fact on aggravating circumstances").
ANSTEAD, J., concurs.
NOTES
[1] Taylor's middle name is Kenneth.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The trial court found the following nonstatutory mitigating circumstances: (1) Taylor was under some mental or emotional disturbance at the time of the crime (some weight); (2) psychological trauma due to abuse and neglect in formative years (some weight); (3) psychological trauma due to deprivation in parental nurturing (some weight); (4) stepfather provided no emotional or parental support (modest weight); (5) neurological impairments affecting ability to control impulses (some weight); (6) learning disabilities, attention deficit problems, and problems with social interactions (some weight); (7) obtained GED in prison (minimum weight); (8) attempts to address and recover from drug dependence (modest weight); (9) good worker and dependable employee (minimum weight); (10) agreed to be interviewed and cooperated with the police (minimum weight); (11) history of substance abuse dating back to pre-teen years (some weight); (12) under the influence of alcohol at time of crime (little weight); and (13) appropriate conduct during trial (little weight).
[4] Although not challenged by Taylor, this Court independently reviews the evidence to determine whether sufficient evidence exists to support his first-degree murder conviction. See Sexton v. State, 775 So.2d 923, 933 (Fla. 2000) ("[I]t is this Court's independent obligation to review the record for sufficiency of evidence."). We conclude that there was competent, substantial evidence to find Taylor guilty of the first-degree murder of Sandra Kushmer.
[5] We reject Taylor's claim that the existence of a prior violent felony aggravator should not bar the application of Ring to death sentences.
[6] At trial, Dr. Scott Gallagher, who was chief resident of surgery at Tampa General Hospital and treated Maddox for his head injuries, testified that Maddox's injuries were "the most significant or severe assault to the head in a patient that I have seen survive."