IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

GREGORY BENDER,

      Appellant,

v.
                                        Case No.  5D21-1498
                                        LT Case No. 2018-100625-CFDL

STATE OF FLORIDA,

      Appellee.
_____/

Opinion filed April 14, 2023

Appeal from the Circuit Court
for Volusia County,
Dawn D. Nichols, Judge.

Michael Ufferman, of Michael
Ufferman Law Firm, P.A.,
Tallahassee, for Appellant.

Ashley Moody, Attorney General,
Tallahassee, and Kristen L.
Davenport, Assistant Attorney
General, Daytona Beach, for
Appellee.

SOUD, J.

Appellant Gregory Bender was indicted on one count of first-degree premeditated murder for the death of Patrick De La Cerda. A jury of Bender's peers found him guilty as charged. As contemplated by Florida Statutes, he was sentenced to life in prison with no hope of parole. Appellant appeals his judgment and sentence. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const.; Fla. R. App. P. 9.030(b)(1)(A). We affirm.

I.

On February 27, 2018, De La Cerda was shot to death by Appellant. De La Cerda was murdered at his residence in Volusia County. Appellant was a resident of Orange County.

At the time of his death, De La Cerda was in a relationship with Vidya "Jessica" Devnani. Prior to her relationship with De La Cerda, Devnani was involved in a relationship with Appellant, which she ended after Appellant refused to leave his then-wife. Subsequent to her breakup with Appellant, Devnani and De La Cerda began dating. During this relationship, Appellant would leave messages on Devnani's phone threatening her, De La Cerda, and De La Cerda's family. As a result of these threats, Devnani obtained an injunction prohibiting Appellant from contacting her.

2

On the morning of February 27, De La Cerda's father Max received a phone call from an individual claiming to have a package for his son.[1] After the father could not reach De La Cerda by text messages or phone calls, the father asked his girlfriend, Shannon Chamberlain,[2] to check on De La Cerda.

That same morning, Devnani received two phone calls from Appellant's phone, which she did not answer. The phone calls worried Devnani, who at that time had not been contacted by Appellant for a few months. As a result of the phone calls, Devnani checked on De La Cerda. After De La Cerda did not answer several phone calls, Devnani went to check on him at his residence. De La Cerda's body was found at his residence first by Chamberlain, who was later joined at the scene by Devnani.

The Volusia County Sheriff's Office began its investigation into the murder of De La Cerda. In addition to recovering shell casings and projectiles at the scene, Volusia County Sheriff's Office detectives determined De La Cerda's laptop and a digital storage unit connected to the security system on the property were missing. Detectives also, *inter alia*, initially interviewed a

---

[1] A sign was posted at the gate to the driveway leading to De La Cerda's residence that instructed those delivering a package to call the victim's father Max at Max's phone number.

[2] Chamberlain owned the Volusia County property where De La Cerda resided.

number of witnesses, including Max De La Cerda (the victim's father), Chamberlain (the victim's father's girlfriend), and Devnani.

As the Volusia County Sheriff's Office investigation into the murder of De La Cerda was underway, and in light of Appellant's phone calls to Devnani in the morning of February 27, which violated the injunction she had obtained, Appellant was arrested that evening on the misdemeanor charge of violation of injunction.[3] Appellant was arrested by the Orange County Sheriff's Office in the front yard of his residence in Orange County, Florida. Appellant alleges that at the time of his arrest, numerous deputies went into his residence.

Importantly, on February 28, 2018, Appellant's ex-wife Daymara Sanchez-Bender contacted the Volusia County Sheriff's Office (through counsel) and provided a statement, with her counsel present. Sanchez-Bender advised detectives that in December 2017, while she and Appellant were still married and just prior to their divorce, she found a blue spiral notebook in their home belonging to Appellant. The notebook contained writings that Sanchez-Bender believed to be a detailed plan to kill De La Cerda. The writings, which Sanchez-Bender recognized as Appellant's handwriting, included driving directions, notes about taking clothes, seeing

---

[3] Appellant admitted making these phone calls during a controlled call with Devnani that was monitored by detectives.

4

how many cars were at the location, removing any cell phone from De La Cerda's residence so that nobody could call 911, and a reference to killing De La Cerda.

That same day, February 28, the Volusia County Sheriff's Office sought and obtained a search warrant for Appellant's residence. In cases like this involving more than one law enforcement agency's jurisdiction, once the Volusia County Sheriff's Office believed probable cause existed for a warrant to search Appellant's residence located outside of its jurisdiction, the facts and background information about the case were communicated to the Orange County Sheriff's Office, which then prepared the affidavit seeking the search warrant. Importantly, Volusia County Sheriff's Office detectives provided the narrative portion to the Orange County Sheriff's Office to be included in the affidavit. At the time they sought the search warrant, Volusia County Sheriff's Office personnel were unaware any law enforcement officers purportedly had conducted a "protective sweep" or search of Appellant's house the night before, when he was arrested for violation of the injunction.

More specifically, Volusia County Sheriff's Office Sergeant Seth Amrhin testified he wrote the affidavit seeking the search warrant for Appellant's residence. He further testified that the information in the affidavit

5

came from the Volusia County Sheriff's Office's investigation of the murder and witnesses to whom detectives spoke. Amrhin testified that he did not include in the affidavit any information learned by the Orange County Sheriff's Office at the time Appellant was arrested at his home on the evening of February 27 (the day of the murder).

As part of the ongoing investigation of De La Cerda's murder, detectives executed the search warrant for Appellant's residence on February 28—the same day it was obtained and the day after Appellant's arrest for violation of injunction. During execution of the search warrant, detectives recovered from a wastebasket in Appellant's home two crumpled pieces of paper that bore only Appellant's fingerprints and contained handwritten notes described at trial as the "murder plan." Detectives also collected live ammunition and a spent shell casing of the same caliber and type used to murder De La Cerda. Importantly, the projectiles recovered from the crime scene were all fired by the same gun. Likewise, the same gun fired the spent shell casings recovered from the crime scene and the spent shell casing recovered from Appellant's home.

Appellant was ultimately convicted of the first-degree premeditated murder of De La Cerda and sentenced to life in prison. This appeal followed.

II.

Appellant raises four grounds on appeal. We affirm and write to address the trial court's denial of Appellant's First Amended Motion to Suppress Evidence filed prior to trial.

Appellant moved to suppress all evidence obtained from the search of his residence pursuant to the search warrant. Specifically, Appellant asserted that the affidavit submitted to obtain the search warrant contained information learned when Orange County Sheriff's Office deputies unlawfully entered and searched Appellant's home on February 27, 2018, when he was arrested on the violation of injunction charge. The trial court properly denied Appellant's motion.

A.

In reviewing a trial court's ruling on a motion to suppress, we must independently review mixed questions of law and fact. *Fitzpatrick v. State*, 900 So. 2d 495, 513 (Fla. 2005), *as revised on denial of reh'g* (Apr. 21, 2005). A trial judge's ruling on a motion to suppress is clothed with a presumption of correctness with regard to determinations of fact. *Id.* It is the province of the trial judge to make determinations concerning the credibility of the witnesses and the weight of the evidence. *See Ortiz v. State*, 24 So. 3d 596, 600 (Fla. 5th DCA 2009); *see also Tarver v. State*, 961 So. 2d 1094

(Fla. 2d DCA 2007). The trial court's resolution of conflicting evidence will not be disturbed on appeal as long as the trial court's findings are supported by competent, substantial evidence. *See Tarver*, 961 So. 2d at 1096. However, "the determination of whether the application of the law to the historical facts establishes an adequate basis for the trial court's ruling is subject to de novo review." *Fitzpatrick*, 900 So. 2d at 513 (quoting *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001)).

B.

At the hearing on Appellant's First Amended Motion to Suppress, Appellant testified that deputies entered his residence after his arrest. Numerous deputies and detectives testified at the hearing as well. With the exception of one deputy, all law enforcement personnel testified they did not enter Appellant's house on the night of his arrest or they did not recall doing so.

Orange County Sheriff's Office Deputy Brandon Swank is the only deputy who testified that he entered the residence as an unknown number of deputies "cleared the house." He testified he went just inside the front door into the living room and "helped security right there." Deputy Swank further testified that he was directed by a superior officer to clear the house. While Deputy Swank could not recall which superior officer gave that order, he

8

believed it was Sergeant Steve Strickland. However, Sergeant Strickland testified he did not at any time direct any officers to clear the house.

Based on the totality of the evidence presented at hearing, the trial court concluded there was no protective sweep or search of Appellant's house. The trial court's determination in this regard is supported by competent, substantial evidence. Numerous deputies testified there was no entrance into the house by law enforcement officers. Further, a supervising deputy testified no entrance was made and no command was given to perform a protective sweep or search of Appellant's house. The supervising deputy's testimony in this regard was corroborated by a detective.

Even though one deputy testified differently from the others, the trial court made its determination as to credibility of specific testimony offered and resolved conflicting testimony. "Absent unusual conditions and occurrences, an appellate court will ordinarily defer to [the credibility determinations of the trial court]." *Pritchard v. State*, 987 So. 2d 204, 205–06 (Fla. 5th DCA 2008) (citing *Taylor v. State,* 937 So. 2d 590, 599 (Fla. 2006)). "The trial court is in a far superior position to judge credibility based on its capacity to observe the bearing and demeanor of the witnesses." *Id.*

Since the trial court's factual conclusion there was no protective sweep or search of Appellant's residence when he was arrested is supported by competent, substantial evidence, the trial court's denial of Appellant's First Amended Motion to Suppress is due to be affirmed.

C.

Further, even assuming *arguendo,* as Appellant claims, there was a warrantless search of his residence violative of the Fourth Amendment's protection against unreasonable searches and seizures, the evidence would not have been excludable at trial and denial of Appellant's motion was still appropriate under the independent source doctrine.

The exclusionary rule will generally require suppression of evidence discovered pursuant to an unlawful search or seizure. *See State v. White*, 660 So. 2d 664, 666 (Fla. 1995) ("The exclusionary rule inhibits governmental breach of the principles embodied in the Fourth Amendment by prohibiting governmental use of evidence seized in violation of the rule."). However, "[t]he 'exclusionary rule' has no application where the government can show it has learned of the challenged evidence from an 'independent source.' The rule applies where the illegal search or seizure was not an *actual cause* of the discovery of the subject evidence." *O'Hare v. State*, 263 So. 3d 255, 259–60 (Fla. 5th DCA 2019) (citation omitted).

10

The independent source doctrine[4] "applies when evidence is discovered as a result of unlawful police activity but is also discovered independently through a lawful investigation that occurs either before or after the illegal activity, so long as the independent investigation itself is 'untainted by the initial activity.'" *Id.* (citations omitted).

In short, law enforcement's decision to obtain a search warrant for Appellant's residence is untainted by—and was not prompted by—any alleged observation during a purported sweep or search of Appellant's residence when he was arrested on the violation of injunction charge. Further, no evidence was obtained as a result of the alleged protective sweep or search of Appellant's house at the time of his arrest.

A review of the affidavit submitted by law enforcement in seeking the search warrant makes clear it is based entirely on the investigation of the Volusia County Sheriff's Office and is independent of any purported sweep or search of Appellant's residence by the Orange County Sheriff's Office at

---

[4] The independent source doctrine is closely related to the inevitable discovery doctrine, which itself is an exception to the exclusionary rule. The inevitable discovery doctrine permits admission of challenged evidence obtained during an unlawful search if the preponderance of the evidence establishes that such information ultimately or inevitably would have been discovered by lawful means. *O'Hare*, 263 So. 3d at 259 (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

11

the time of Appellant's arrest. The affidavit seeking the search warrant described finding De La Cerda's body at his residence, described the residence, noted spent shell casings were observed, and indicated the digital storage unit for the surveillance system was missing from the residence. The affidavit further contained important information obtained by detectives from interviews with De La Cerda's girlfriend Devnani, De La Cerda's father, Chamberlain (the father's girlfriend who first discovered De La Cerda's body), and Appellant's ex-wife Sanchez-Bender.

Importantly, Devnani told detectives Appellant was jealous of De La Cerda and had repeatedly threatened to kill her and De La Cerda if they continued their relationship, even to the point of brandishing a firearm in November 2017. Devnani obtained an injunction for protection against the Appellant before the murder because of his conduct and threats. Further, Devnani advised that Appellant called her on the day of the murder, which is a violation of the injunction for which Appellant was arrested.

Appellant's ex-wife Sanchez-Bender informed detectives, *inter alia*, that she had discovered a blue spiral notebook containing an extensive and detailed plan to kill De La Cerda, which was quite similar to the facts of the murder. Sanchez-Bender also confirmed Appellant owned several firearms

located in the house and remained in possession of them after issuance of the injunction in favor of Devnani.

As a result of the Volusia County Sheriff's Office's investigation and the witnesses' statements described in the affidavit, the entirety of which is born from sources wholly independent of any purported search of Appellant's residence at the time of his arrest, law enforcement officers believed "an immediate exigency" to search Appellant's house existed so as to protect Sanchez-Bender and prevent destruction of evidence. The trial court issued the search warrant.

### III.

The authorized and reasonable search of the Appellant's residence led to the discovery of considerable evidence of Appellant's guilt. Admission of such evidence at trial was proper under law. Accordingly, the trial court rightly denied Appellant's First Amended Motion to Suppress Evidence.

AFFIRMED.

It is so ordered.

JAY and BOATWRIGHT, JJ., concur.